Elliott *v.* Elliott.

---

ANNA E. ELLIOTT

*v.*

CHARLES H. ELLIOTT.

1. Defendant sold his home and household goods, and plaintiff (his wife)
went to her sister's by his directions, and with his promise to come there.    He
went to see his sister-in-law, but did not ask to see plaintiff.    He went to live
with a man whose wife was on unfriendly terms with plaintiff, and did not call
to see plaintiff, though he daily passed where she lived.    On a former occa-
sion he had left her, and written that he was not coming back, and had begun,
but failed to prosecute, two suits for divorce.    After suit by plaintiff for
maintenance, he went to another city and opened a boarding-house in partner-
ship with a woman with whom plaintiff was on unfriendly terms.    *Held*, that
there was such an abandonment by defendant, without justifiable cause, as to
entitle plaintiff to sue for maintenance and support under the Divorce act.

2. A request by defendant, after such suit is commenced, that plaintiff will
come and live with him at the boarding-house, and other requests, apparently
insincere, are not such offers to perform his marital duties as will release him
from liability.

On bill, answer, replication and proofs in open court.

*Mr. John W. Wescott*, for the complainant.

*Mr. John W. Wartman*, for the defendant.

GREEN, V. C.

This action is brought under the twentieth section of the
Divorce act, for alimony and maintenance, on the ground that

Elliott *v.* Elliott.

the defendant has, without any justifiable cause, separated him - self from his wife, and neglected to maintain and provide for her.

The parties were married in April, 1880, and lived at Tioga, near Philadelphia, in the state of Pennsylvania, for three years prior to May, 1890, the defendant having been engaged there in business, and having-purchased and become the owner of real and personal property in that place.

Some time in the month of April, 1890, he made a contract to sell his real estate at Tioga, and spoke of his intention of going himself to California. The agreement for sale was consummated by a deed therefor, dated April 28th, 1890, for the consideration of $7,500.

He procured the signature of his wife to this conveyance by agreeing to give her, and giving her, $500 of the consideration money.

On the 19th and 20th of May following he sold out all of his personal property, including household goods. After the sale on the 20th, which was on Tuesday, his wife asked him where he was going to stay, to which he replied he did not know whether he would stay in the empty house or not, but that the best thing she could do was to go home with her sister, who was present, and who lived in Camden; that he did not know whether he would be over the next day or not, but that he would be over on Thursday.

In obedience to this direction his wife went direct, with her sister, to the sister's residence in Camden, to which place the husband came on Thursday, as he had promised, but the object of his visit appears to have been to get some money which the sister owed him for goods which she had purchased at the vendue, and after getting which he went out, not having asked for his wife. When he was on the outside the wife opened the window and asked him, "Are you not coming back to-night?" to which he replied he did not know whether he would be back to-night or not, but he did not come back that night, or at any time until after the commencement of the suit. He, however, took up his residence in Camden with the family of a Mr. Eberlie, a family with which his own had formerly been on terms of intimacy, but

Elliott *v.* Elliott.

it appears that for over a year previous to this time his wife and Mrs. Eberlie had not been on speaking terms. He did not call at the sister's, or on his wife, although he daily went past the house in which he knew she was staying.

She commenced this action by filing the bill on the 6th of June, A. D. 1890.

The short space of time intervening between their breaking up housekeeping in Tioga and the commencement of this suit, standing by itself, would scarcely warrant this court in assuming that there was such separation, by the husband, as to justify the making of a decree for maintenance. But in this case facts and circumstances, both prior and subsequent to this period of time, have been introduced for the purpose of characterizing the conduct of the husband, and of showing that it was not a mere temporary lapse of duty.

Nine months after the marriage, in April, 1880, the defendant left his wife and went to the State of New York, under a promise to return in a short time. Within a month he wrote to her that he would not come back, which was the only direct communication she had from him. She, however, did receive notice of an action commenced by him, in the State of New York, for the purpose of procuring a divorce, which suit she immediately took steps to defend, and which never, so far as appears, proceeded any further.

After an absence of over a year he returned to Camden, in February, 1882, taking up his residence in that city. After his return he commenced another action against his wife in this court for divorce *a mensa et thoro*, on the ground of cruelty, in which suit the wife filed her answer, denying the charges. He saw his wife frequently, going to the church which she attended, but making no advances, and not even speaking to her until the month of December, 1882, when he sought her out and a reconciliation took place.

The testimony with reference to the conduct of the defendant towards his wife while they were living together, although furnishing no sufficient cause to justify her to leave him, indicates

that the restraints imposed upon him by his matrimonial duty were anything but congenial to his taste and feelings.

On his wife refusing to sign the deed for the conveyance of the real estate sold at Tioga, unless she was paid a certain amount, which, according to the testimony of Mr. Stewart, he agreed to give her, he insisted, on his payment of the $500, that she should sign a receipt for the same as "in advance for support." This was some two weeks before the sale of the personal property and the breaking up of his home, and is, under the circumstances, indicative of the intent upon his part to separate himself from his wife, and of a purpose to fortify himself with this receipt for this money as evidence that it had been paid by him to her for her support during the period of such separation, to which, it might be assumed, she thereby consented.

He must have known for some time that his home would be broken up by his sale at Tioga, yet he made no arrangement whatever to provide another for himself and his wife. He sent her to her sister's in Camden, where he was also invited to come and offered a temporary home. His wife having, in obedience to his direction, gone to her sister's, instead of accepting the invitation and joining her there, he went to the residence of another lady, with whom he must have known his wife was not on speaking terms. He lived at this house without visiting his wife, or in any way communicating with her, although he passed her house day by day, until about Thanksgiving Day last, when he, with Mrs. Eberlie, jointly, bought out the furniture and good will of a boarding-house in Pine street, Philadelphia, for which he paid $850 and she $400; and since that time these parties have conducted the boarding-house as partners, living there, and he in no wise, except as is hereinafter noted, having any communication with his wife.

It is contended that the rule is, that if a wife herself leaves the husband, the burden of proof is thrown upon her to show that she was justified in so doing. This rule, however, does not apply in this case, for although it is true the wife left the former home in Tioga, still it was not until after the sale of the furniture

and personal property, and the breaking up of that home, and at his express direction to go to Camden to her sister's.

The evidence then shows the case of a defendant who, on a previous occasion, had separated himself from his wife under a pretext of business; who had then sought another jurisdiction and appealed to its courts for a divorce; who, unsuccessful there, had returned to his father's home, in the city in which the wife lived, residing there for nearly a year, constantly brought within her presence, never recognizing her or in any way communicating with her, attempting again, through this court, to obtain a divorce; who, after reconciliation, conducted himself in a way which, he must have known, was a source of annoyance if not unhappiness to his wife; who breaks up their home and disposes of his property, without making any provision for their future comfort, sends his wife to her sister's, refuses an invitation to make his home at the same place, goes to live with a person with whom he knows his wife is unfriendly, day by day passes the wife's place of residence without a call or any communication, and then joins this lady in a business partnership, as boarding-house keepers, in the city of Philadelphia, and takes up his residence there without consultation with his own wife.

There is nothing in the evidence to warrant a suspicion of any criminal impropriety in this association, but it has in it, inherently, an element of permanence, and, from the relations which existed between his wife and his partner, he must have known that it must be carried on without her co-operation and countenance. I cannot but regard this as being a separation by the husband from the wife, without justifiable cause, within the meaning of the statute.

The statute, however, requires not only separation or abandonment, but also a refusal or neglect to maintain and provide for the wife. There has been no refusal, because there has been no demand until the commencement of this action. The statute, however, is in the disjunctive, it is "refusal or neglect," and it is undeniable that there has been a neglect on his part to provide for his wife, unless his payment to her of $500 can be considered as relieving him from that charge.

The testimony of Mr. Stewart, the purchaser of the property and a lawyer practicing in Philadelphia, is clear and explicit upon this question. He says :

" The deed was executed on the twenty-eighth of April, and on the third of May they came to my office for a settlement; I drew the checks, and Mr. Elliott asked me to draw a receipt 'for support' for this five hundred dollars, and I told him that he had made a mistake ; that I did not do that kind of business ; and I told him that it was perfectly understood that she was to have five hundred dollars for signing that deed, without any stipulation whatever, and he then said he would draw the receipt himself, and he drew the receipt in his own handwriting, and Mrs. Elliott requested me to give her a copy of it; when I saw what it was I said to Mrs. Elliott, ' You can sign this or leave it alone, just as you please; your bargain with your husband, and I understood it perfectly, was fair and square, and that was, that you were to have five hundred dollars for signing that deed; as for this receipt for support and such matters as that, that is another consideration altogether, and, according to the laws of the State of Pennsylvania, you are not bound to sign it;' but he refused to give her the money unless she did sign it; I drew the check to her order for five hundred dollars, and I have it here to-day; and it was perfectly well understood that it was drawn as part of the consideration for that property."

The receipts reads :

"Received May 3, 1890. Five hundred dollars in advance for support.
(Signed) "ANNIE E. ELLIOTT."

The evidence in the case goes to show, that when he desired to sell this property she at first refused to join in the deed unless he paid her $1,500, but that afterwards she agreed to sign the deed and assist him in that way to make the sale if he would pay her $500, and that there was a fair and express agreement between them that this payment was to be made to her in consideration of her execution of the deed as conveying her right of dower.

The receipt, by known rules, is subject to explanation, and is of no binding force against the contention of the wife. The transaction appearing by the evidence to have been such as it was, it cannot successfully be maintained to have been a contribution made by him to her maintenance and support.

But it is claimed that the complainant is not entitled to the relief sought because the defendant has manifested a desire to dis-

charge his marital duties, and that his separation from his wife has been in consequence of her refusal to comply with his reasonable propositions. In support of this insistment it is claimed that the defendant on two or three occasions has made proper advances to his wife to put an end to the separation, and that she has unjustifiably refused to accede to his request.

The first occasion was after the commencement of this suit, and on or about the 16th of June. According to the testimony of defendant's sister with whom she was living, defendant came to her house with a furniture wagon and another man; that the complainant was not at home, and defendant stated that he had come to get certain goods which he claimed belonged to his wife. The sister was very justly incensed, not only at his own personal conduct, but because he brought a strange man to the house, and up into the bed-rooms, without so much as asking her permission, and did what she could to make him quit the premises. I do not, however, understand that on this occasion he saw his wife.

Some time after that he again visited the sister's house, and inquired for his wife from some of the parties who were there, and was told that there was nobody there who wished to see him. On leaving the place he saw his wife in the second story window, spoke to her, and said, "If you want to go to housekeeping, come along." She did not assent, and he then remarked, "That is all I want."

On another occasion he met his wife in front of his counsel's office, in the city of Camden, and there asked her to live with him, but she desired time for reflection and consultation before giving him an answer. He expressed his willingness, on the stand, to have his wife return to him, and, when the question was submitted to her, she hesitated much about giving any direct answer to such proposal.

I cannot see, either in the visits to her sister's house where she resided, or in his interview on the street, any indication of sincerity. The man was living in domestic and business relations with another, which he knew his wife could not countenance or join. He had no other home to take her to, and admitted on the stand that up to that time he had provided no place for her

·comfort or shelter.   While the law regards a sincere and honest desire, on the part of the husband, to put an end to an unfortunate separation between himself and his wife with favor, and as tending to relieve him from responsibilities the law might otherwise impose upon him, it cannot give such effect to the simple declaration of a defendant in a suit already commenced, without any manifestation by act or effort, that his proposition is sincere, or made with the expectation of having it accepted.   Less weight is to be given to such declaration of a party, as a witness in the trial of a suit to make him liable for separation, which has not been preceded or is not accompanied or followed by any practical manifestations of sincerity.   Much of the testimony given in behalf of the complainant would have been otherwise immaterial, if it were not for the episode which occurred during her examination with reference to her hesitancy in accepting the proposition made in open court for her to return to her husband ; but, judged in the light of that evidence, and the history of her former matrimonial experience, I am not prepared to say that she was not excusable for not accepting with alacrity, without assurance of some substantial kind of her future comfort, the proposition so made.

The evidence makes it so appropriate that I quote, *in extenso,* the words of the chancellor in the case of *Boyce* v. *Boyce, 8 C E. Gr. 337* (at *p. 349*): " There is no justifiable cause for the abandonment shown.   I shall not consider whether her ungoverned temper, her frequent outbursts of passion, the abusive and scurrilous epithets bestowed on him, and her perseverance in tantalizing him, were not occasioned or justified by his harsh treatment of her in the instances before mentioned, and others. But if they were not provoked by him they are not crimes, but the infirmities and defects which, in consideration of law a husband undertakes to put up with when he takes his wife for better or worse.   In morals, it may be different.   A man cannot desert his wife because she is extravagant, or lazy, or swears, or uses coarse language, or is sickly, fretful, or of violent temper ; or because she wreaks her temper, or showers her coarse or profane language upon him, and thus makes his life uncomfortable.   In-

·compatibility of temper has not as yet, in New Jersey, been made by law a ground of divorce or for desertion."

In my opinion, the evidence shows that the defendant has, with-·out justifiable cause, separated himself from his wife, and has neglected to maintain and provide for her; and a decree must be made for a suitable support, to be paid and provided by the de-·fendant for her, and, taking into consideration the condition of the defendant's means, and the wants of the complainant at the present time, I advise that an allowance of $3 a week be made to the wife, with a counsel fee of $25.